OPINION
Plaintiff-appellant/cross-appellee, VMB Systems, Inc., appeals the decision of the Mahoning County Court of Common Pleas granting judgment in favor of defendant-appellee/cross-appellant, Exal Corporation, in the amount of $13,840. Exal Corporation has also filed a cross-appeal in this matter to that part of the judgment entry granting judgment in favor of VMB Systems, Inc. in the amount of $25,166.
Exal Corporation (hereinafter "Exal") manufacturers aluminum cans at a facility in Youngstown, Ohio. The manufacture of said cans involves several procedures. Once the cans are given their basic shape, they are given an internal lacquer and several external coatings. At each of these stages, the coatings are cured in special ovens. Two byproducts of the process are excess heat and volatile organic compounds (VOCs), the latter of which are subject to regulation by the Ohio EPA.
In order to reduce its VOC emissions to comply with Ohio EPA regulations, Exal contracted with VMB Systems, Inc., a New York based company (hereinafter "VMB"), for the design and installation of a catalytic oxidation system. The system was designed by John Kroehling of John H. Kroehling and Associates, Inc. (hereinafter "JHK"), an agent for VMB. The initial proposal called for a system of ducts to remove the exhaust from the ovens and lacquer spraying machines to a catalytic oxidation unit, or incinerator. Sometime later, Kroehling proposed the addition of a heat exchanger to convert the excess heat from the incinerator into a means of cooling or heating Exal's plant. The proposal called for VMB to supply the catalytic incinerator and to design the duct work, which was installed by Roth Brothers, a local contractor. The plan anticipated exhaust from three can-coating lines, although initially only two lines would be operating. Once the third line became operational, an additional ten catalytic modules would become necessary.
In 1993, only one can-coating line was operational, with no apparent problems. In early 1994, another can-coating line was installed, at which point Exal began to experience problems with the curing of the base coats on its cans, as well as unpleasant odors within the plant. It was subsequently discovered that the duct carrying exhaust from lines one and two was too small. Kroehling suggested to Exal that the duct line be increased from 16 inches in diameter to 24 inches in diameter in order to increase the exhaust flow. The solution eventually agreed upon was that when line three was installed, the exhaust from line two would be incorporated into the duct from line three, while the original duct would be used just for line one. In the interim, Exal slowed production from 150 to 80 cans per minute.
The cost for the additional duct work to correct the problem was the subject of discussions between Kroehling and Patrick Wilster, operation's manager for Exal. According to Wilster, the additional ducting would cost $15,000. While Exal and VMB were disputing this additional duct work, Exal issued a purchase order for the ten catalytic modules that were required for the incinerator once line three was operational. According to Wilster, notwithstanding the dispute, there was never any question that the modules would be required. Having failed to reach an agreement with VMB over the duct work, Exal contracted with Roth Brothers who converted the exhaust line from line two into the new duct for line three. Once the new duct work was installed, the problems with the base coatings ceased.
Exal also had difficulty with the heat exchanger that was added to the proposal. The original heat exchanger was supplied by Cannon Boiler Works according to specifications provided by VMB, and contained a bi-metallic coil. The heat exchanger was installed sometime in 1993 and within two and a half years it was leaking coolant. To remedy this problem, Exal replaced the coil with a duplex metallic coil purchased from Cannon, and no further problems were experienced. The cost of the replacement coil was $13,840. In addition, Wilster testified that an exhaust stack located outside of the plant had suffered severe rusting and would need to be replaced.
On October 2, 1996, VMB filed a complaint against Exal in the Mahoning County Court of Common Pleas seeking the sum of $25,166 plus interest. VMB then filed an amended complaint seeking $25,000 which sum represented the total cost of the ten catalytic modules shipped by VMB to Exal for use in the incinerator. On February 4, 1997, Exal filed its answer and a counterclaim against VMB. The counterclaim alleged that the inadequate duct system had caused damage to the heat exchanger and the exhaust stack, and further alleged breach of contract, breach of warranty and negligence claims against VMB. At the same time the answer and counterclaim were filed, Exal also filed a third-party complaint against JHK and Kroehling individually.
A trial on the matter was held before Magistrate Judge Joseph Bryan on November 12 and 20, 1997. Following various post-trial motions, the magistrate issued his decision on May 7, 1998. The magistrate found that although the 16-inch duct specified by VMB had been inadequate, Exal had failed to prove its damages on the issue. Specifically, Exal had failed to present evidence as to how much it had cost to switch the ducts from line two into the duct system for line three. With respect to the exhaust stack, the magistrate ruled that Exal had failed to establish that VMB had designed or provided the specifications for that portion of the exhaust system, and that therefore VMB was not liable for the cost of repair or replacement. In addition, the magistrate found that Exal had again failed to prove its damages on the issue.
With regards to the leaking heat exchanger coil, the magistrate found that VMB's design and specifications had been inadequate and that Exal had been damaged in the amount of $13,840, the amount paid to replace the coil. The magistrate also ruled that Exal did not dispute the necessity or the price of the ten catalytic modules, but had refused to pay for them on the grounds of its counterclaim for other defects in the system.
Accordingly, the magistrate granted judgment against Exal in favor of VMB on the issue of the catalytic modules in the amount of $25,166 with 10 percent interest from September 15, 1995. In addition, Exal was granted judgment against VMB in the amount of $13,840 with 10 percent interest from November 1, 1996 on the faulty heat exchanger. The third-party suit against JHK and Kroehling was dismissed, the magistrate finding that at all times JHK had been an agent for VMB.
Following the filing of objections to the magistrate's decision from Exal and VMB, on August 13, 1998 the trial court adopted the magistrate's decision as its own. VMB filed a notice of appeal to the trial court's decision on September 10, 1998, and on September 18, 1998, Exal filed a notice of cross-appeal.
Although not designated as assignments of error, VMB presents two issues for our review, the first of which states:
 "Whether the Lower Court erred in finding that the Plaintiff-Appellant is liable to the Defendant for damages resulting in breach of contract and/or breach of warranty. Specifically, did the Court err in finding that the Plaintiff-Appellant's actions in any way caused any damages whatsoever." (Emphasis sic.)
VMB argues that the magistrate did not specifically find that VMB was guilty of negligence, breach of contract and/or breach of warranty relative to the failed heat exchanger. Specifically, VMB notes that the magistrate did not make a finding that VMB caused the damage to the heat exchanger. VMB notes that Exal's counterclaim relative to the heat exchanger sounds in negligence only, and that Exal failed to establish a duty on the part of VMB. In addition, VMB notes that if it had specified the particular heat exchanger in question, it would have owed a duty to Exal to utilize the skill normally used by engineers in specifying heat exchangers, but notes that VMB denied, and continues to deny, that it specified the particular heat exchanger in question. VMB also notes that the record is devoid of evidence relating to the standard of care to be used in specifying heat exchangers or evidence showing that VMB deviated from any such standard.
VMB also claims that Exal was required to prove that any design inadequacy in fact caused the resulting damage. VMB notes that no evidence was presented on this point, but rather the heat exchanger could have failed due to faulty maintenance, faulty manufacture, or faulty design.
VMB also argues that even if Exal's claim is based on a breach of warranty claim, the warranty set forth in the contract does not relate to the design of the exhaust duct work, but rather to the equipment supplied by VMB. Therefore, because VMB did not supply the heat exchanger, Exal's claim cannot be based on a breach of warranty.
In response, Exal argues that the record contains ample evidence from which the magistrate could have concluded that VMB was liable to Exal for having provided improper specifications for the heat exchanger. Exal argues that VMB undertook to provide the specifications and that having done so, VMB was obligated to insure that the heat exchanger functioned normally in coordination with the rest of the exhaust system it had designed. Exal argues that the cost of a proper replacement is an obvious and direct consequence of VMB's failure to do so, for which VMB is liable.
The evidence regarding the heat exchanger is somewhat confusing. Exal's counterclaim alleges that the improperly designed exhaust system damaged other equipment in the plant including a "Cannon Feedwater Heater", which, from its description, appears to be the item elsewhere referred to as the heat exchanger. However, the Cannon Feedwater Heater is not mentioned in the contract between Exal and VMB. Rather the contract lists, as one of the components of the system, a heat exchanger supplied by Exothermics Corporation, with Model No. 8000SP98HT, designed for 65.9 percent effectiveness in the transfer of heat energy from the catalyst exhaust to the incoming stream. In handwriting, the contract then states that there is an additional cost of $8,400 for a heat exchanger with 70 percent efficiency, which addition is initialed by Kroehling. The next page of the contract contains the warranties for the equipment, which are in pertinent part as follows:
 "1. All equipment furnished under this proposal shall be in accordance with good engineering practices as developed by VMB.
 "2. All equipment furnished under this proposal is guaranteed to be free from defects due to faulty workmanship or material for a period of twelve (12) months, commencing from the date of initial start-up, or commencing from a date six (6) months after shipment, whichever date occurs first. BUYER agrees to promptly notify VMB in writing as to the date of initial start-up.
"* * *
 "8. VMB responsibility for machinery, controls and equipment manufactured by others and supplied to VMB under this Proposal is limited to the guarantees furnished by those manufacturers."
According to Wilster, the heat exchanger had been proposed by Kroehling. The former testified as follows:
 "Q. Okay. And who proposed the addition of the heat exchanger?
"A. John Kroehling.
 "Q. And pursuant to the proposal in Exhibit C, who was to provide specifications for —
 "A. I don't think it's in here as to how that's done, but John did.
"Q. John was to provide those specifications?
"A. Yes." (Tr. 67-68)
Wilster also testified that within two and a half years of installation the heat exchanger leaked coolant from the coil and that the specifications for the coil were developed by Kroehling. On cross-examination, Wilster stated that he had not personally taken the heat exchanger apart to determine the cause of its failure, but that somebody else had.
During cross-examination of Kroehling, counsel for Exal made reference to a letter dated January 23, 1993 in which Kroehling informed Exal as follows:
 "With Direct Air's modification of their steam requirements, I redesigned the VMB Catalytic Oxidizer flow diagram to accommodate the lower steam demand and yet include a heat exchanger in the VMB package to minimize natural gas usage." (Def. Ex. K)
Counsel for Exal then inquired as follows:
 "Q. So as early as January, 1993 you were designing this system to accommodate a heat exchanger?
 "A. No. The — that heat exchanger, that's a hot water heater. The heat exchanger is a primary heat exchanger to accommodate the primary stream. They call that a heat exchanger, but it's a hot water heater or a waist [sic] heat boiler. The heat exchanger referred to in here is the primary heat exchanger to save natural gas in the catalytic oxidizer.
 "Q. And your proposals at all times and your design plans at all times provided provision of the catalytic system manufactured by VMB; correct?
 "A. Yes, the design of the catalytic oxidizer alone." (Tr. 170-171)
As already noted, the magistrate ruled that VMB had failed to correctly design and specify the heat exchanger coil. Specifically the magistrate stated:
 "The evidence showed that VMB's design and specifications failed as to the coil tubes, and Exal was damaged in the amount of $13,840.00. * * * [T]he measure of damages to which Exal is entitled, whether based on the theory of breach of contract, breach of warranty, or negligent design, is the cost to make Exal whole, that is, to correct the defect. Exal has established damages, for which VMB is liable, in the amount of $13,840.00 to correct the problem with the coil."
VMB's claim that it failed to specify the heat exchanger is not supported by the record. The contract between the parties, indicates the specific type of heat exchanger to be installed, and the cost to increase the efficiency of this unit. Nothing in the record explains why a heat exchanger manufactured by Cannon was installed rather than the Exothermic unit specified in the contract. However, it is clear that Exal relied on VMB to specify the correct unit.
VMB concedes that a party specifying a heat exchanger owes a duty to utilize the skill normally used by the engineers in specifying such items, but argues that no evidence was introduced pertaining to this standard of care or that VMB deviated from it. To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom. Mussivand v. David (1989),45 Ohio St.3d 314, 318. Even construing the evidence in favor of Exal, the record establishes only that VMS specified the particular type of exchanger and that two and a half years after installation it was malfunctioning. No evidence was presented concerning the duty of care owed by Kroehling in his capacity as an engineer, nor was it established that the coil failed because Kroehling specified an incorrect type as opposed to the part itself simply malfunctioning. As such, Exal failed to establish that Kroehling had been negligent in specifying the particular heat exchanger in question.
Nor was VMB liable on a breach of warranty theory. VMB specifically excluded any implied warranties and further provided that all equipment provided under the proposal would be "in accordance with good engineering practices as developed by VMB." While Wilster testified that he understood this phrase to mean that everything short of an act of God would be covered, Exal failed to present any evidence to establish that VMB had failed to comply with good engineering practices.
The magistrate's decision fails to indicate the basis upon which VMB was liable for the heat exchanger. Our review of the record fails to demonstrate that VMB was liable under a breach of warranty theory or under a negligence theory. As such, in the absence of any fault on the part of VMB, the magistrate erred in awarding Exal $13,840 for the heat exchanger.
Appellant's first issue presented is found to have merit.
VMB's second issue presented for review is as follows:
 "Whether the Lower Court erred in awarding pre-judgment interest to the Defendant-Appellee for those sums so awarded."
VMB argues that none of the criteria for pre-judgment interest as set forth in R.C. 1343.03 were present in the instant case. However, to the extent that the award of damages for the heat exchanger is found to be error, the award of pre-judgment interest with respect thereto is similarly found to be error.
Accordingly, VMB's second issue presented has merit.
In its cross-appeal, Exal presents two issues for review, the first of which states:
 "WHETHER THE COURT BELOW ERRED IN FINDING THAT THE PARTIES HAD AGREED TO SETTLE THEIR DISPUTE WHERE AN EMPLOYEE OF EXAL TESTIFIED TO THAT AGREEMENT, THE COURT DID NOT FIND THAT TESTIMONY TO BE INCREDIBLE AND THE AGENT OF VMB WITH WHOM THE AGREEMENT WAS REACHED NEVER TESTIFIED TO THE CONTRARY."
Exal argues that it was uncontradicted at trial that Exal and VMB entered into an agreement to settle Exal's claim concerning the defective duct system for $14,000. Specifically, Exal notes that Wilster testified that Kroehling had agreed on behalf of VMB to provide Exal with $14,000 toward the cost of correcting the problems with the exhaust system, and that Wilster had accepted this proposal prior to VMB's attempt to renege on it. Hence, Exal argues that VMB breached this enforceable contract. Therefore, Exal argues it was entitled to the $14,000 agreed upon and sought in its complaint. VMB has failed to respond to either of Exal's cross-issues.
At trial, Wilster testified that VMB had offered to help Exal with the modifications needed to correct the problems with the exhaust system. Specifically, Wilster testified as follows:
 "Q. Okay. And did he [Kroehling] make any offer in return?
 "A. Yeah. He said that VMB would help us; because of this problem that he and VMB would help us.
"Q. Did he offer any dollar amount that might be?
 "A. I think the figure was thrown out there about $14,000.
"Q. And did you agree to that amount?
 "A. Well, I did. I did agree to that. And later in conversations with him he said no, no, no, that meant $14,000 was what VMB anticipated the cost of the duct work itself, not the labor to install it, but just the manufacture of the duct work, and that they would give us $14,000 with [sic] worth of pipe." (Tr. 88-89)
Elliot Bavers, a manager for VMB, testified to being aware that at some point Kroehling had offered to assist Exal in the construction of the new exhaust system for lines two and three. Specifically Bavers testified as follows:
 "Q. Mr. Bavers, did you ever offer EXAL $14,000 to settle this matter?
"A. No.
 "Q. Did you offer them $14,000 or equipment at the cost of $14,000?
"A. Yes.
"Q. Tell the Judge how that works.
 "A. We offered them approximately $25,000 worth of duct work at our cost, which would have been about $14,000, plus the cost of shipping, which would be another thousand, perhaps.
 "Q. And that was a benefit you were willing to confer on them?
"A. Yes.
"Q. Did EXAL accept that offer?
"A. No." (Tr. 186-187)
The magistrate found that while the evidence was conflicting as to whether VMB had offered $14,000 in cash or $14,000 worth of ducting, the preponderance of the evidence showed that the offer was for $14,000 in ducts and that the offer had not been accepted.
A release, or compromise agreement, is a particular kind of contract, and, like other contracts, requires a definite offer and an acceptance thereof. Noroski v. Fallet (1982), 2 Ohio St.3d 77,79. A reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use their observations in weighing credibility of the proffered testimony. McSweeney v.Jackson (1996), 117 Ohio App.3d 623, 632. The record contains competent credible evidence to support the magistrate's determination that the offer was for $14,000 worth of ducting material, and that said offer was not accepted.
Exal's first issue presented is without merit.
Exal's second issue presented is:
 "WHETHER THE COURT BELOW ERRED IN ITS DIRECTIONS TO THE CLERK TO ENTER JUDGMENT FOR VMB IN AN AMOUNT GREATER THAN THE AMOUNT INDICATED IN THE DECISION OF THE MAGISTRATE JUDGE AND GREATER THAN THE LIQUIDATED AMOUNT THAT VMB SOUGHT IN ITS COMPLAINT."
Exal argues that the trial court erred in entering judgment for VMB in the amount of $25,166 as opposed to the $25,000 sought in VMB's complaint. In addition, Exal notes that the parties stipulated to $25,000 as the amount of Exal's liability, and urges this court to correct the amount in the judgment.
As Exal correctly notes, VMB's amended complaint sought $25,000, as opposed to the $25,166 in the initial complaint. The evidence established that the sum was for ten modules at $2,500 each. Indeed, the $25,000 figure was agreed to by both parties in a stipulation. The magistrate's decision offers no explanation for awarding $25,166 as opposed to the amount sought in the amended complaint. Rather, the award of $25,166 appears to be a clerical error on the part of the magistrate. As such, Exal's second issue presented has merit.
Accordingly, that portion of the trial court's decision awarding damages in the amount of $13,840 plus interest against VMB is hereby vacated. The judgment entered in favor of VMB against Exal is hereby modified to reflect an award in the amount of $25,000 plus interest at the rate of 10 percent per annum from September 15, 1995. In all other respects, the decision of the trial court is hereby affirmed.
Cox, J., concurs
Waite, J., concurs
APPROVED:
 _____________________________ Gene Donofrio Judge